EL PUEBLO, PETICIONARIO Y APELADO *v.* PORTO RICO RAILWAY LIGHT AND POWER COMPANY, DEMANDADA Y APELANTE.

Apelación procedente de la Corte de Distrito de San Juan, Sección Segunda, en pleito sobre *injunction.*

No. 1370.—Resuelto en junio 19, 1917.

FRANQUICIAS — DERECHOS ADQUIRIDOS — INTERPRETACIÓN DE FRANQUICIAS. — Una concesión de derechos en bienes de dominio público que ha sido aceptada por el beneficiario, equivale a un contrato por el que se adquiere el derecho a estar protegido contra cualquier perjuicio por la acción del estado; y aun cuando la concesión debe ser hecha en términos claros para que confiera derechos privados en bienes de dominio público y evite el sucesivo dominio del privilegio en interés público, dicha concesión debe interpretarse de un modo razonable y no de tal modo que anule la intención del concesionario, y cuando existe ambigüedad ésta debe ser de naturaleza tal que no desaparezca por las reglas de interpretación establecidas.

SENTENCIA—DEFINICIÓN DE.—Una sentencia es la conclusión de la ley sobre las cuestiones contenidas en los autos, o la aplicación de la ley a las alegaciones y a los hechos según los ha declarado probados la corte, o admitido las partes, o estimádose que existen por razón de rebeldía. Que sólo es una sentencia la pronunciada entre las partes en la acción sobre las cuestiones sometidas a la corte para su decisión. Que la misma debe ser congruente no solamente con las pruebas, sino también con las cuestiones presentadas por las alegaciones, y será nula si se aparta de las alegaciones y se basa en un caso no alegado en las mismas.

APELACIÓN—TEORÍA DEL CASO—ACTITUD INCONSISTENTE CON LA ADOPTADA EN EL JUICIO.—La teoría sobre la cual el caso fué juzgado en la corte inferior, deberá seguirse estrictamente en apelación, y una parte no puede en la corte de apelación asumir una actitud inconsistente con la adoptada por ella en el juicio.

Los hechos están expresados en la opinión.

Abogado del apelante: *Sr. J. Henri Brown.*

Abogados del apelado: *Sres. Howard L. Kern, Attorney General* y *Salvador Mestre, Fiscal del Supremo.*

EL JUEZ ASOCIADO SR. HUTCHISON, emitió la opinión del tribunal.

A principios del año 1913, en un punto de Puerta de Tierra situado entre la antigua cárcel municipal, hoy fábrica de la American Tobacco Company y el caño de San Antonio, donde está colocada la vía y tiene su derecho de paso la compañía apelante sobre terrenos del Gobierno Insular y junto a la vía y derecho de paso de la American Railroad Company que está entre la carretera y otros terrenos del Gobierno Insular por el norte y los manglares utilizados como vertederos de basuras y las aguas de la bahía de San Juan por el sur, construyó el Departamento de Sanidad a través de dicha vía y raíles de la compañía apelante, un cruce o paso a nivel para uso de sus carros de basuras, pudiendo así pasar directamente dichos carros de la carretera al sitio escogido para vaciar dichas basuras en vez de tener que cruzar una distancia de algunos cientos de metros hacia el este como hasta entonces había sido la costumbre, entre el edificio de la American Tobacco Company y la estación del telégrafo sin hilos. Después de haber ocurrido un accidente que ocasionó la muerte a uno de los conductores de dichos

carros de basuras, la compañía demandada quitó algunos de los tablones colocados entre los raíles de su vía, imposibilitando así el paso por el cruce que de tal modo fué construído sin darse ningún aviso a dicha compañía, por lo que en seguida el Departamento de Sanidad o el Comisionado del Interior procedieron simultáneamente a reponer los tablones que fueron quitados y a obtener la expedición de un auto de *injunction* preliminar para conservar el estado así creado.

Si suplimos las palabras en que se basa principalmente el Gobierno, las cuales fueron omitidas al transcribirse la sección 11 de la franquicia concedida a la apelante, a saber, "o dentro del espacio reservado para ello," y enmendamos una ligera inexactitud en la traducción al castellano del texto inglés de dicha sección, en la petición se alega lo siguiente:

"Que en marzo 29 de 1913, y con anterioridad a dicha fecha, había un paso sobre la línea del tranvía de la compañía demandada, en un punto situado en el barrio de Puerta de Tierra, San Juan, que queda frente al predio de terreno usado por el Pueblo de Puerto Rico para la celebración de la Feria Insular; estando dicho paso distante como a doscientos metros de la entrada principal del edificio de la 'Antigua Cárcel,' que ahora utiliza la Porto Rico American Tobacco Company como fábrica, al este de dicho edificio.

"Que en marzo 29 de 1913, se utilizaba dicho paso y se había utilizado mucho antes de dicha fecha, como medio de entrada y salida hacia el predio de terreno poseído por El Pueblo de Puerto Rico y utilizado por el Departamento de Sanidad del Gobierno Insular como vertedero de basuras. Que dicho paso se usaba sólo por los carros del Departamento de Sanidad que eran necesarios para el uso de dicho terreno al fin al que se le había destinado.

"Que los raíles de la compañía demandada en el punto en que está situado el paso están colocados en el espacio reservado para la vía pública.

"Que por las disposiciones terminantes de su franquicia, fechada mayo 6 de 1909, bajo la cual la compañía demandada está explotando su línea de tranvía, dicha compañía demandada está obligada a mantener sus vías y el espacio adyacente a las mismas situado a un pie y medio a cada lado de dichas vías, de acuerdo con las siguientes disposiciones (hacemos referencia a la copia de dicha fran-

quicia que va adjunta a la presente solicitud y se hace parte de la misma) :

" 'Sección 10.—Cuando las vías adicionales del concesionario crucen o descansen sobre vías públicas o calles, dichas vías serán construídas y mantenidas como se dispone en la sección 11 de la presente; y donde quiera que se construyan dichas vías adicionales, bajo las condiciones de esta franquicia, sobre terrenos públicos insulares, que no sean carreteras ni calles, por la presente se da al concesionario el derecho de usar y ocupar para dichos fines un derecho de paso que no exceda de ocho metros de ancho, con la anchura adicional que fuese necesaria para el declive de cortes y parapetos; y donde quiera que sea necesario para el concesionario ocupar terrenos privados para dichos fines, por la presente se le autoriza para usar, ocupar y obtener un derecho de paso sobre los mismos, que no exceda de ocho metros de ancho con la anchura adicional que sea necesaria para el declive de parapetos; *Disponiéndose,* que entre la parada siete de la actual línea de tranvías y la calle que parte de la carretera militar hacia el Union Club, el concesionario podrá ensanchar su derecho de paso en una anchura que no exceda de ocho metros adicionales; *Disponiéndose, sin embargo,* que si cualquier parte de dichas vías adicionales cruzan cualquier terreno que haya sido reservado por el Presidente para fines militares, navales o federales, el permiso para cruzar y utilizar dicho terreno debe obtenerse por el concesionario de la debida autoridad.

" 'Sección 11.—El derecho de paso del tranvía ya construído continuará utilizándose y ocupándose por el concesionario como hasta aquí y como más adelante se disponga; *Disponiéndose,* que nada en esta franquicia se entenderá que da al concesionario ningún derecho adicional de paso sobre cualquier camino, a no ser lo aquí consignado, ni que le autoriza a expropiar cualquier parte del mismo.

" 'Donde quiera que dichos raíles crucen o descansen sobre el camino u otra vía de tránsito público, el lecho de la vía entre los raíles y por un espacio de un pie y medio sobre cualquier extremo de ella, deberá mantenerse por el concesionario a satisfacción del Comisionado del Interior y dicho lecho de vía deberá construirse y mantenerse de modo que no intervenga con el debido drenaje y mantenimiento de dicho camino o vía pública.

" 'Siempre que lo ordenare el Comisionado del Interior el espacio que se halla comprendido entre los raíles de la vía del concesionario donde cruce, o descanse sobre un camino público, o vía pública, o dentro del espacio reservado para ello, deberá alterarse y repararse

por el concesionario de acuerdo con los planos de dicho Comisionado. Si el concesionario deja de hacer dichas alteraciones o reparaciones, podrán hacerse por el Comisionado, y el costo de ellas podrá ser cobrado del concesionario.'

"Que no obstante lo requerido de la compañía demandada por las disposiciones de la franquicia citada anteriormente, dicha compañía ha faltado completa y totalmente a ellas y rehusa mantener dicho cruce en dicha condición y en el estado de reparación que se requiere de dicha compañía por el Comisionado del Interior de Puerto Rico, aun cuando los raíles de la compañía demandada descansan sobre el espacio reservado para la vía pública en el punto en que está situado dicho paso.

"Que dicha compañía faltando al deber y obligación impuéstole, en marzo 29 de 1913, por conducto de sus agentes, sirvientes o empleados, levantó y quitó de un todo las tablas que constituían dicho paso y subsiguientemente ha rehusado colocarlas de nuevo, como era su deber y obligación, según se especifica anteriormente.

"Que el día 15 de mayo de 1913, el Comisionado del Interior de Puerto Rico ordenó a la compañía demandada a restaurar dicho paso, según lo requería su franquicia, y en contestación a esta orden el Comisionado del Interior recibió una carta de la compañía demandada, fechada mayo 21 de 1913, rehusando cumplir dicha orden.

"Que el día 3 de junio de 1913, el peticionario, por medio de sus agentes, sirvientes o empleados, ordenó la colocación de los entarimados y tablas que constituían dicho paso que fuesen colocadas en la misma condición en que estaban anteriormente, actuando de acuerdo con la disposición contenida en la franquicia de la compañía demandada, arriba citada, que da al Comisionado del Interior el derecho a mantener las vías de la compañía demandada y el espacio adyacente a dichas vías en tal condición, como crea el Comisionado del Interior propia, en el caso de que la compañía demandada rehusare cumplir las órdenes del Comisionado del Interior en dicho sentido.

"Que dicha compañía demandada amenaza quitar y remover dichos entarimados y tablas que constituyen dicho paso, y continúa amenazando violentamente y por fuerza hacerlo, impidiendo que se mantenga dicho paso en su anterior estado, uso y condición.

"Que el peticionario, por medio de su Departamento de Sanidad, sufrirá grandes perjuicios y pérdidas irreparables, si no se permite que subsista dicho paso dónde y cómo anteriormente estaba. Que cualquier otro medio de acceso o entrada y salida a dicho vertedero

de basuras es impracticable y difícil y le causaría grandes inconvenientes y gastos a dicho Departamento de Sanidad.

"Que el peticionario simplemente pide que el status sea mantenido hasta que los derechos en dicha controversia sean finalmente resueltos."

Al dictar el juez sentenciador su sentencia a favor del peticionario emitió la siguiente opinión:

"Por medio de esta acción el peticionario pretende obtener de esta corte una orden definitiva, dirigida a la compañía demandada, prohibiéndole que estorbe el uso acostumbrado del paso establecido sobre la vía férrea que dicha demandada tiene construída entre la ciudad de San Juan y el pueblo de Río Piedras, en el sitio que está frente al predio de terreno usado por el Pueblo de Puerto Rico para la celebración de la Feria Insular, y distante como unos doscientos metros hacia el este de la entrada del edificio de la Porto Rican American Tobacco Co., y que asimismo se le prohiba en definitiva que la demandada quite o haga que se quiten los entarimados construídos sobre dicha vía, o que en cualquier otra forma impida o estorbe el paso de los wagones del Departamento de Sanidad que conducen las basuras que han de verterse en un predio de terreno que dicho Departamento tiene para tal fin destinado.

"La demandada compareció ante esta corte solicitando que la petición de *injunction* fuera desestimada, por las razones expresadas en la contestación escrita que obra en el récord de este caso.

"Hay aquí solamente una cuestión de hecho que decidir, a saber: si la vía que la demandada tiene establecida entre la ciudad de San Juan y el puente de San Antonio, lo está en el punto usado por el Departamento de Sanidad para el paso de los carros de basuras, dentro de la zona de la carretera, y si esto aparece de la evidencia ofrecida por el peticionario, su derecho resulta claro.

"Después de haber hecho un estudio minucioso de la evidencia ofrecida por ambas partes, condensaremos en muy pocas palabras nuestros puntos de vista sobre esta interesante cuestión.

"Sea cual fuere el ancho que la carretera hubiera tenido originalmente, la evidencia, en nuestra opinión, ha establecido que la doble vía que la compañía demandada tiene construída en el lugar en donde está situado el puente del demandante, lo está en un espacio reservado para la carretera; y la razón nos parece muy sencilla: todos los terrenos situados al sud de la carretera, tanto los pertenecientes a El Pueblo de Puerto Rico como los de propiedad privada,

colindan en su punto norte con la carretera central; y del plano oficial resulta también que el límite sud de dicha carretera central en el punto en donde está situado el puente, está determinado por una línea recta·que sigue la misma dirección de la fachada principal del muy antiguo edificio que originalmente se llamó hospital civil, más luego cárcel, y actualmente es propiedad de la American Tobacco Company, cuya línea recta pasa a una distancia de un metro de la parte más saliente de la fachada principal del referido edificio, y queda, al sud de la doble vía de la demandada y a una corta distancia de la misma, estando, por consiguiente enclavada dicha vía en el terreno no afirmado o intransitado de la carretera, pero sí dentro de la porción o zona reservada para ella. ⸏Toda la evidencia ofrecida. por el demandante justifica sobradamente esta afirmación.

"Por otra parte, el ·tranvía que originalmente estuvo establecido entre San Juan y Río Piedras, y que primeramente fué propiedad .de Don Pablo Ubarri, funcionaba con una sola vía que se construyó .al principio sobre la parte afirmada de la carretera central; pero más después las necesidades del tránsito exigieron que dicha vía se ·colocara fuera de la carretera y así.se hizo, previo un estudio llevado ·a cabo por el ingeniero Don Tulio Larrínaga, quien·ha sido un testigo importante en este juicio y quien declaró que al redactar la 'memoria ·descriptiva' que presentó con tal motivo y decir en ella que la vía del tranvía propiedad del Señor Ubarri, debía ser sacada fuera de la carretera, se refería simplemente a aquella parte de la carretera ·en que *intervenía el tránsito,* pero no se trataba de otros terrenos ni de ·expropiar ninguna propiedad privada.

"Además·de esto, la sección 11 de la franquicia de once de mayo de 1909, bajo la cual tiene constituída la compañía demandada sus líneas de ferrocarriles, y que fué presentada como evidencia por el peticionario, dispone, entre otras cosas lo siguiente:

"'Siempre que lo ordenare el Comisionado del Interior, el espacio por donde cruza o descansa la vía del concesionario sobre un ·camino público o vía pública, *o dentro del espacio reservado para ello,* será alterado o reparado por el concesionario de acuerdo con los proyectos de dicho Comisionado. Si el concesionario dejase de hacer ·dichas alteraciones o reparaciones, podrán hacerse·por el Comisionado, y el·costo de ellas podrá recobrarse del concesionario.'

"Es claro, que de acuerdo con esta sección de la franquicia, El ·Pueblo de Puerto Rico tiene derecho de establecer un paso sobre las ·vías de la compañía demandada en cualquier sitio en que la vía des·canse 'sobre un camino público o vía pública, o dentro del espacio

reservado para ello,' y que además de esto tiene el derecho de exigir a la compañía demandada que haga tales alteraciones y reparaciones en tales sitios de acuerdo con lo proyectado por el Comisionado del Interior o si la compañía dejase de hacer aquellas alteraciones y reparaciones podrán hacerse por el Comisionado del Interior por cuenta de dicha compañía. Y es claro que bajo esta sección de la franquicia no es necesario que el peticionario pruebe que el paso o sitio en cuestión que él trata de que se mantenga, está situado sobre un camino público o una vía pública, sino que basta demostrar que está 'dentro del espacio reservado para un camino público o vía pública.'

Posteriormente la compañía demandada ensanchó el terraplén sobre el que estaba construída *la sola vía* original, para establecer otra vía más, paralelas y junto a la primera que le permitiera el doble tráfico de sus carros eléctricos, pero no se ha traído evidencia alguna que demuestre que los terrenos sobre los cuales estaba construída primeramente la sola vía, eran propiedad exclusiva de la demandada y que aquellos otros sobre los cuales se construyó la doble vía, pertenecían por igual concepto, ni en el caso de que tales porciones de terrenos le fueron cedidos por autoridad competente, a quienes se les privó de su posesión para cederlos a la compañía demandada.

"Este es un punto cuya determinación es muy importante, porque si todos los terrenos situados al sud de la carretera central, colindan por su lado norte con dicha carretera, como ya hemos dicho, indudablemente que la porción en ellos ocupada por la compañía demandada para el establecimiento de sus vías, o pertenecen a la carretera o son propiedad de los colindantes con ella, y esto no ha sido claramente expresado ni en la concesión original del Señor Ubarri, ni en la franquicia que el Consejo Ejecutivo otorgó a la demandada, ni aparece, por otro lado, vendido por los propietarios colindantes, ni se tiene noticia tampoco de que existía ningún procedimiento de expropiación.

"La evidencia ha demostrado asimismo, que el lugar por donde cruzan hoy la vía de la demandada los carros de la Sanidad, es el único paso posible para llegar al sitio en donde se vierten las basuras, pues el antiguo camino que se usaba cuando las basuras se depositaban en un lugar más próximo, o sea cruzando por el lado oeste del edificio de la American Tobacco Company, queda muy lejos del punto en donde estos trabajos se realizan hoy, siendo además un camino arenoso que en los tiempos de lluvia se convierte en fango que llega hasta el eje de los carros cuando pasan, causando dificultades en el

tránsito y grandes gastos al Departamento de Sanidad en la reparación de sus carros.

"La demandada alega en su contestación a la demanda, y sobre ese extremo han declarado también algunos de sus testigos, que el cruce por encima de sus vías, en la forma en que ha sido establecido por el Departamento del Sanidad, estorba el servicio de la compañía y constituye un peligro para el funcionamiento de sus carros eléctricos; pero una simple inspección ocular practicada en el lugar en donde está situado el puente objeto de este litigio, como la que fué llevada a cabo por la corte, nos convence fácilmente de lo contrario de esta afirmación. Dicho puente tiene una extensión longitudinal de veinte metros noventa y cuatro centímetros por un ancho de cuatro metros treinta y dos centímetros, y una persona de pie situada en cualquier sitio del frente después de cruzar hacia el sud la doble vía de la demandada, puede ver un carro eléctrico desde que pasa de la esquina norte del edificio de la American Tobacco Company en todo su curso hasta el puente de San Antonio y vice versa; y de igual manera que cualquier motorista puede ver cualquier carro de los usados por el Departamento de Sanidad desde que pasa del sitio indicado o desde que sale del puente de San Antonio, teniendo tanto dicho motorista, como el conductor de los carros del Departamento de Sanidad el tiempo suficiente para adoptar cualquier medida que evite el choque de ambos vehículos.

"Por las consideraciones expuestas, creemos que la demanda en este caso debe ser declarada con lugar."

La primitiva franquicia para el uso del camino que ahora posee y explota la compañía apelante fué concedida en el año 1878 y el trozo de vía envuelto en este pleito fué primeramente colocado sobre el lecho de la carretera. Poco tiempo después se autorizó debidamente el levantamiento de dicha vía del camino y su reconstrucción por la línea que ahora ocupa la compañía como derecho de paso.

Que el trozo de camino en cuestión fué de tal modo reconstruído en esa fecha sobre un terraplén en terrenos pantanosos que entonces estaban bajo el agua cuando subía la marea, no descansaba ni sobre la carretera militar ni sobre terrenos reservados para ella, es cosa que a penas si admite discusión. Las manifestaciones vagas y no satisfactorias hechas por varios testigos en contestación a las preguntas sumamente su-

gestivas que les hicieron los abogados del Gobierno y que fueron permitidas a pesar de las constantes objeciones de los abogados contrarios no suministran una base tangible para la teoría que pretende establecerse con ellas de que la vía y derecho de paso de la compañía apelante estaban dentro de lo que desde tiempo inmemorial se había tenido como "carretera" o "perteneciente a la carretera," o como "parte" de la misma o de la "zona reservada para ella." El poco valor que pudiera dársele a esta prueba está más que contrarrestada por el hecho que ha sido admitido, de que no existe constancia oficial o prueba documental de semejante zona o reserva, así como por los preceptos terminantes de la ley española sobre carreteras. Y es bastante con sólo examinar ligeramente los autos para que quede destruído el valor que le ha dado el juez sentenciador al extracto aislado que ha hecho de la declaración del antiguo ingeniero que a principios de su larga carrera había redactado la memoria descriptiva de 1881. Considerado ese documento a la luz de la declaración prestada por su distinguido autor y examinado en conjunto, habla por sí y no vemos que sea necesario entrar en una consideración de los pormenores de este aspecto del caso.

En una inscripción hecha en el registro de la propiedad se dice que los terrenos donde está situada la antigua cárcel colindan por el norte con la carretera, que este terreno fué traspasado al Estado por las autoridades militares en el año 1867, y vendido en subasta pública a la municipalidad en el año 1876. En una nota marginal se hace mención de la segregación de una parcela vendida a Alfredo Salomón, y en una segunda inscripción de fecha mayo 6, 1891, hecha a nombre de la municipalidad se describe el edificio situado con frente a la carretera.

En una certificación expedida por el superintendente de puentes y terrenos públicos que se encuentra archivada en el Departamento del Interior de fecha noviembre 27, 1902, se hace constar que a instancias del Alcalde de San Juan, el

Superintendente de Obras Públicas ordenó que se procediera al deslinde de estos terrenos con arreglo al plano oficial hecho en 1880; que dichos terrenos están situados en la "tercera zona del barrio de Puerta de Tierra de esta capital, adyacente a la margen sur de la carretera No. 1 y en el trozo comprendido entre la primera y segunda líneas defensivas de esta plaza"; y que "afecta esta parcela como el plano indica, la figura *a. b. c. d. e. f.*, compuesta al oeste por un rectángulo *a. b. c. f.* de 140 metros de largo medidos en dirección paralela al eje de la carretera y de 100 metros de ancho en dirección normal de ese eje; unido a ese rectángulo por el lado *e. f.* prolongación al lado *a. f.* que para a 1 metro del saliente más al norte del citado edificio. La base menor *d. e.* del trapecio, normal también al eje de la carretera, mide 85 metros. El lado *a. b.* coincide con el paramento exterior de la berma de cimiento del muro oeste del edificio; habiéndose trazado primitivamente esta línea *a. b.* a 150 metros de la cresta *g.* de la contra escarpa del saliente más al este de la segunda línea defensiva y medidos ambos 150 metros siguiendo la línea *g. h.* paralela al precitado eje de la carretera."

En el informe anual del Gobernador del año 1907, y en la página 324 del mismo, el Comisionado del Interior dice lo siguiente:

"Una de las más importantes mensuras practicadas por el despacho de terrenos públicos durante el pasado año era la relativa a la fijación de los límites de la reserva naval, por virtud de la cual quedaron definitivamente precisados los límites de la propiedad insular y de la propiedad naval por una comisión conjunta nombrada por el Secretario de la Guerra y el Gobernador de Puerto Rico.

"El Hon. Frank Feuille, fiscal general de Puerto Rico, fué designado por el gobernador para actuar en unión del capitán retirado de la Marina de los Estados Unidos, Samuel C. Lemly, en representación del Departamento de Marina, con el fin de arreglar ciertos desacuerdos surgidos entre el Departamento de Marina y el Gobierno Insular con relación a las colindancias de cierta parcela de terreno reservada por el Presidente de los Estados Unidos, por virtud del poder conferídole por la Ley del Congreso de julio 3 1902. Este

arreglo era muy necesario y de gran importancia para la isla, puesto que deja determinadas definitivamente ciertas cuestiones acerca de las cuales había existido disputa por mucho tiempo.

"Por virtud del arreglo el Gobierno adquirió el terreno que está a ambos lados de la 'Carretera central,' o carretera militar, a la entrada de la zona urbana de la municipalidad de San Juan. Este terreno es de mucha utilidad para la extensión de nuestro sistema de edificios públicos, parte del cual ha de ser dedicado a la edificación del nuevo edificio del Capitolio.

"También adquirió el gobierno los terrenos que están frente y a lo largo del caño de San Antonio lo que proporcionará mayores facilidades al puerto de San Juan, para el desenvolvimiento de su comercio.

"Con esta concesión el Gobierno podrá reclamar unas 100 cuerdas de terreno de manglares que están situadas a lo largo del canal y convertirlas en terreno que pueda utilizarse para muelles, almacenes, etc.

"El Gobierno Insular traspasa al Departamento de Marina unas 12 cuerdas de terreno en Puerta de Tierra y el Presidio, o edificio de penales situado frente al mar inmediatamente debajo del Palacio. El terreno conocido por la 'Puntilla,' donde está el actual Arsenal ya había sido concedido al Departamento de Marina por proclama oficial del Presidente, completando el Presidio esa parcela de terreno.

"El Attorney General da claros detalles del arreglo respecto a estas propiedades en su informe presentado este año al Gobernador.

"Puede verse fácilmente cuál es la propiedad adquirida por el Gobierno con sólo examinar el mapa que se acompaña al informe."

Ni en el informe del Comisionado del Interior, ni en el del Fiscal General en el mismo volumen, página 55, como tampoco en los autos que han sido sometidos a la consideración de este tribunal, con excepción de lo que más adelante se determina, hay nada que indique que estuvieran en disputa los límites de la carretera insular, o de algún modo envueltos en el arreglo Lemly-Feuille, o en alguna forma relacionada con el objeto que se perseguía al nombrar a estos comisionados.

En una proclama posterior del Presidente, "traspasando al Pueblo de Puerto Rico ciertos terrenos y edificios reser-

vados para fines de los Estados Unidos," entre otras parcelas se describía la siguiente:

"Al sur de la carretera en Puerta de Tierra. Parcela situada en la tercera zona del barrio de Puerta de Tierra, del Municipio de San Juan, colindando por el norte con la carretera No. 1 y al oeste con los terrenos propiedad de la antigua cárcel, ahora fábrica de la American Tobacco Company, siendo sus colindancias las siguientes: Partiendo de un punto situado en el ángulo noreste de esta parcela de terreno, que en el plano se señala con el No. 1, punto que está a una distancia de 302 metros del ángulo noroeste del edificio que fué cárcel anteriormente y en la línea que se extiende en la misma dirección del lado del frente de dicho edificio y que pasa a una distancia de un metro de la parte de más proyección del lado norte del edificio; de ahí y desde ese punto en dirección a esta línea, la margen del sur del mencionado camino S. 67° 44′ 34.8″ E. En la división sexagesimal o 124°.73, en la división centesimal, 405.65 pies o 123 metros y 63 centímetros, al punto No. 2 * * *."

Aunque el juez sentenciador no identifica el "plano oficial," al que hace referencia en su opinión, como que fija la colindancia del sur de la carretera o de la zona reservada para ella, evidentemente que tuvo presente el comprobante No. 1 del peticionario que según se describe en su faz es "una parte de los terrenos pertenecientes al Pueblo de Puerto Rico en Puerta de Tierra, San Juan, "de fecha mayo 31, 1913, y que es una, sino la única, prueba documental que fué admitida sin objeción, sin duda por haber sido expresamente ofrecida "solamente para determinar el sitio donde está instalado el paso a nivel y terrenos alrededor," y que ahora se alega que constituye "prueba de reputación" en cuanto a las verdaderas colindancias de la carretera pública.

La declaración del Jefe de la División de Terrenos Públicos con relación a este plano en parte es sustancialmente como sigue:

"No sé precisamente el año en que fué construída esa carretera, pero hace más de 30 o 40 años; para demarcar estas líneas que yo digo zona de la carretera, los datos para determinar esos límites, cuando se fueron a determinar los terrenos para la reserva naval, se mar-

caron sobre el terreno esa faja de terreno de veinte metros de ancho
como el límite de la carretera; eso fué hecho por el entonces Jefe de
la .División Don Armando Morales, pero yo trabajé personalmente
como empleado; se establecieron los puntos para determinar los lí-
mites de la carretera, para demarcar los límites de los terrenos que se
iban a utilizar para la estación naval; eso fué cuando vino el Ca-
pitán Landy de los Estados Unidos para separar los límites de la
reserva naval, y se acordó entonces marcar esas parcelas A. B. y C.
en éste y al otro lado de la cárcel; las dos entidades que se enten-
dieron en fijar estos límites de las reservas del Gobierno de los Es-
tados Unidos fueron un representante del Departamento de Marina
de los Estados Unidos y un representante del Gobierno de Puerto Rico;
el objeto del acto realizado por las partes, por estos funcionarios,
fué fijar los límites, demarcar las colindancias de las parcelas de te-
rreno, que se iban a reservar entonces, a favor del Departamento
de Marina; ese fué el objeto de los planos que se levantaron entonces,
que fué el año 1905.   Para determinar la línea sobre lo que se llama
zona de la carretera, no tomé como datos los monumentos estable-
cidos por esta comisión que levantó los planos, las parcelas no se
habían reservado aún, se iba a demarcar lo que se iba a reservar.   Yo
tomé como lado sur de la carretera la línea norte del terreno vendido
por el ayuntamiento para la antigua cárcel; de modo que la prolon-
gación de esa línea a ambos lados, constituía el lado sur de la carre-
tera; después al lado norte, a partir de la piedra del ángulo sudeste
de la reserva militar, se hizo el año 1903 paralelamente al lado sur
de la otra línea.   Cuando yo intenté fijar las colindancias de las
parcelas de terrenos que se iban a reservar a favor del Departamento
de Marina de los Estados Unidos, para fijar los límites de la carretera
hacia el sur, tomé como base el límite norte del terreno vendido por
el Gobierno al Municipio de San Juan; en otras palabras, la propiedad
que ahora es la fábrica de tabacos que antes era cárcel.   La anchura
del trozo de terreno que quedaba frente a la fábrica de tabacos, que
fué vendido al municipio fué de un metro a partir del lado más sa-
liente del edificio por su lado norte; de modo que para establecer
la línea sur ·de la carretera en este sitio, se prolongó la línea que
representa la colindancia norte de la propiedad vendida por el Go-
bierno al Municipio de San Juan; éste fué el único dato que yo
tuve para fijar la colindancia sur de la carretera.   Para fijar el límite
norte de la carretera, los datos que tuve, partiendo de un monumento
de piedra que está en el ángulo sudeste del terreno ocupado por la
estación del telégrafo sin hilos, línea paralela al lado sur; ese monu-

mento establecido en ese sitio es uno de los ángulos del terreno reservado del ramo de guerra, fijado por el gobierno militar hacia el año 1903, y ese monumento se puso en ese sitio con objeto de marcar la colindancia o límite de la parcela reservada para el ramo militar; no fué un punto fijado por las partes arbitrariamente, como límite de la carretera; antes no existía monumento en ese sitio. Los datos que tuvo el Gobierno en aquel entonces para fijar ese monumento en ese sitio, como vino un ingeniero que se encargó de ese trabajo, y él tomó informes en el Departamento del Interior sobre el límite de la carretera, supongo que ellos le darían ese dato. En el Departamento del Interior no hay ninguna constancia en cuanto al límite de la carretera en ese sitio. En el sitio en donde está el monumento, que se marca No. 7 en el plano, no hay constancia ninguna, sino simplemente el ancho de la carretera; este punto; este monumento fué fijado por el gobierno militar de acuerdo con el Gobierno Insular en el año 1903, como límite de la parcela reservada por el Departamento de la Guerra * * *.

"En resumen, para fijar los límites de la carretera que aparece marcada con el número 1 en el plano, o sea el primer plano presentado por el demandante, yo he tomado como base para el límite sur de la carretera, los límites que fijo que he dicho, en la época cuando se demarcaban los límites de la parcela que iban a reservarse para el Departamento de Marina, pero esto, desde luego, por orden de mi jefe; y prolongando esa línea fué que conseguí la línea que aparece como límite sur de la carretera; y para fijar el límite norte de la carretera tomé como punto de partida el monumento marcado con el número 7 en este plano, un monumento fijado de común acuerdo entre el Departamento de la Guerra de los Estados Unidos y el Gobierno Insular, cuando se demarcaban los límites de la reserva naval; y partiendo de este punto tracé una línea paralela al otro límite que está marcado al lado sur; éstos son los únicos datos que yo tuve para fijar la zona de la carretera; no existe ningún otro dato en el Departamento que yo conozca. La distancia entre estos dos límites paralelos, que yo digo en el plano los límites norte y sur de la zona de la carretera, tiene una anchura de 20 metros; en este plano no se encuentran marcadas las cunetas; la línea que representa la colindancia norte de la carretera, está al norte de la cuneta que existe en este punto; el ancho de la carretera afirmada, transitada en ese sitio, creo que son 6 o 7 metros. No hay otro espacio en ese sitio que pueda utilizarse, que esté en condiciones de utilizarse como carretera. Por ese punto antiguamente la misma línea del trolley

venía al lado norte de la carretera, hay una cuneta en el lado del sur de la carretera hoy día y esa cuneta está al norte de las vías del trolley de la demandada; la distancia que hay, más o menos, entre la vía de la demandada en el punto, diremos del cruce, y la cuneta; entre la vía más próxima y la cuneta, escasamente habrá un metro, no estoy seguro porque ese dato no lo tengo. La distancia entre el límite norte de la zona de la carretera y el raíl más al norte de la vía de la demandada es de 13 metros 8 centímetros. El resto de los 20 metros o sea 6 metros 92 centímetros está ocupado por la vía del trolley y un trozo después de 20 metros, 20 centímetros entre la vía y el límite sur; y toda esta parte ocupada por la vía del trolley, o sea 6 metros y pico está dentro de lo que se llama zona reservada para carretera. En el sitio por donde pasan las vías del trolley por ese cruce y hasta el puente de San Antonio, la vía está sobre un terraplén. Esta línea que yo tengo marcada como límite sur de la carretera, está aquí en el pie del terraplén en toda su distancia, sale de la zona de la curva. Este plano no fué levantado con el objeto de establecer la anchura de la carretera en la zona número 2, este plano se levantó con el objeto de trazar los terrenos a un lado y otro de la carretera, dividiéndolos en solares y reservando la zona de la carretera   *   *   *.

"Esta parcela de terreno aparece en el mapa, marcada A, que dice 'Reserva Naval,' hoy 'Pueblo de Puerto Rico' es una parcela que fué reservada por el Departamento Naval para usos navales y después fué pasada nuevamente al Pueblo de Puerto Rico por proclama del Presidente de los Estados Unidos; con relación al paso a nivel está situado a once metros 88 centímetros del ángulo noroeste de la parcela; el paso a nivel ocupa parte de la parcela y parte de la zona de la carretera.

"La demandada pide la eliminación, Sr. Juez, de la parte de la contestación que dice que el paso ocupa parte de la zona de la carretera. Esta es una cuestión que tiene que resolverse por la corte. Puede ser la opinión del testigo.

"El testigo responde que según el mapa ocupa parte de la zona de la carretera y según el mapa esa parcela colinda al norte con la carretera.

"Repreguntado el testigo Sr. Castro, por la parte demandada, repuso: Dije el otro día que la línea que en este plano marca el límite sur de la carretera, en ese sitio donde está el paso a nivel, está sobre el terreno justamente al pie del terreno sobre el cual están tendidas las vías de la compañía demandada, más o menos. Con respecto a si sé o nó de que en este sitio la compañía demandada al

hacer su doble vía tuvo que conseguir del Gobierno Federal, del Departamento de Marina, una faja de terreno precisamente en ese sitio para ensanchar su terraplén, no estoy enterado, no sé nada de eso. Demandada.—¿Usted no sabe, Sr. Castro, que en este sitio hacia el lado sur en la época en que se hizo la doble vía, fué ensanchado el terraplén hacia el sur, de modo que desde 1909 el paso del terraplén al lado sur ocupa más que antes?

"El testigo responde: yo sé que se ensanchó el terraplén, pero no sé a qué lado. Este plano se hizo hace un par de meses, yo lo hice después de haber tomado los dátos sobre el terreno.

"La representación de la demandada al testigo: de modo que si es verdad que esta línea que Ud. ha marcado en el plano como la colindancia sur de la carretera en ese sitio del cruce, está más o menos al pie del terraplén y si es verdad que el terraplén está ensanchado en ese sitio por concesión hecha por el Departamento de Marina, entonces ¿está incluída en la que Ud. tiene y marca como zona de la carretera, también la faja que fué concedida por el Departamento de Marina? Y el testigo dice: Sí, la faja fué concedida, pero el terraplén está incluído. Yo dije el otro día, contestando a sus preguntas, que la anchura de la zona que yo tengo marcada como zona de la carretera en el sitio donde está el cruce o paso que es objeto de este pleito, fué comprendido en el terraplén en donde está tendida la doble vía de la compañía demandada, y contesté que la carretera que es transitada, con sus cunetas, ocupaba 13 metros setenta y ocho centímetros y que la parte ocupada en el terraplén y vías de la demandada era de seis metros noventa y dos centímetros, pero no era la parte por donde se transita, es el resto de la zona de la carretera a que me referí al decir esta cantidad de trece metros ocho centímetros que se cuentan desde el raíl norte de la vía hasta el lado norte de la zona de la carretera.

&ast;          &ast;          &ast;          &ast;          &ast;          &ast;          &ast;

"  &ast;   &ast;   &ast;   En esta zona de la carretera, en ese sitio donde está el paso a nivel, en este mismo trozo en que se encuentra el paso a nivel marcado en el plano, está incluído algún terreno de la carretera, pero no puedo decir cuánto terreno está incluído al norte de la cuneta, exactamente, porque no he medido."

De la declaración prestada por Armando Morales, Maestro Mayor de Ingenieros Militares, también en el Cuerpo de Obras Públicas Civiles durante el régimen español, Arquitecto y Jefe de la División de Terrenos Públicos por algunos

años después de la ocupación americana, y testigo de la demandada, citamos lo siguiente:

"Anteriormente a esa Real Orden de abril del 97, hubo unas leyes de zonas estrictas en San Juan, y particularmente sobre esa tercera zona, que estaba entre la primera y segunda línea de fortificaciones. El reglamento militar daba 8 metros a la carretera y el Cuerpo de Ingenieros Militares, a que yo pertenecía, era el encargado de esa vigilancia; modificadas las leyes de zonas por la Real Orden de 27 de abril del 97, la comisión de ensanche nombrada, concibió el propósito de ensanchar a 20 metros de amplitud, y en ese sentido empezó sus trabajos la comisión, cuyos trabajos no tuvieron efecto legal, puesto que en eso vino la guerra, llegó el cambio de soberanía y desde luego, la comisión no terminó su cometido; pero había desde luego, el criterio de dar a esa vía general en la carretera una amplitud de 20 metros, desde San Juan hasta todo Santurce, si fuera posible, naturalmente, donde fuera menester dentro de ese criterio y cuando vino la dominación americana, se demarcó una parcela al municipio, y por solicitud de Real Orden durante el Gobierno Español, y se vendió al municipio y se concedió esa parcela, poniendo una longitud de la carretera de 1 metro al norte de la fachada norte de ese edificio, marcando las líneas de fachadas, y como ese criterio se ha seguido en la segunda zona también, de ahí que se ha marcado así. Este proyecto de la comisión de ensanchar la carretera desde San Juan a Santurce a 20 metros, nunca fué llevado a efecto. Durante el tiempo que yo era oficial de Obras Públicas y de los Ingenieros Militares y luego después del cambio de Soberanía se consideraba la anchura de la carretera en ese sitio siempre la misma amplitud, los 8 metros * * *

"Según mi entender, la carretera siempre ha tenido ocho metros de ancho y nada más; hago esa afirmación en virtud de que conozco oficialmente las primeras disposiciones de esa carretera número 1 que marcaban ocho metros y sobre eso se ha pensado varias veces. En los informes hechos por Obras Públicas, se ha tratado siempre de que la falta de comunicaciones se debe a esa escasez de amplitud; eso lo conozco por informes oficiales. Yo intervine como Jefe de Terrenos Públicos del Departamento del Interior, en el deslinde que se hizo de los terrenos navales y en virtud de ese deslinde, fundado en ese deslinde, es que el Presidente de los Estados Unidos hizo su proclamación reservando terrenos públicos para usos navales. Si viera los planos recordaría cuál es la parcela A de los terrenos reservados

para usos navales donde se vierte la basura en Puerta de Tierra.
\* \* \*

"Continuó el testigo señor Morales diciendo: en ese predio no intervine directamente por una razón, porque al empezar a trazar en ese predio, precisamente los encargados del Gobierno Federal mandaron a arrancar todas las estacas y el Gobernador Post y yo hemos ido personalmente al terreno, cuando trazamos las de aquí. Precisamente estando como encargado de la división no hemos llegado a este predio nunca, porque han variado las estacas los encargados, porque decían que no estaban facultados para dividir terrenos, y después que cesé en la división no intervine directamente; cuando ese predio yo no era jefe entonces; eso ha sido posterior, yo no era jefe cuando se trazó ese predio. Yo dí los informes sobre el proyecto que se tenía de dar una amplitud de veinte metros; yo dí algún informe sí señor, en ese sentido, de llevar adelante el proyecto, informé, particularmente pero es posible que informara oficialmente, no recuerdo; no he tenido para qué recordar, pero si informé sería apoyando el criterio que tenía de que se diera a esa vía la amplitud de veinte metros; el criterio del ensanche en esa extensión de San Juan a Martín Peña; que se diera a esa vía una amplitud de veinte metros; cuando dí ese informe es porque creí que la carretera no tenía los veinte metros, porque la carretera no tenía más que ocho metros; oficialmente no tenía más que ocho metros; yo no digo que dí informe falso, como oficial público, porque de acuerdo con mis jefes entonces así se hizo. Nosotros éramos jefes de sección, éramos simples oficiales."

*Presentádole al testigo en el examen de repreguntas la certificación de fecha veinte y siete de noviembre de 1902, *supra*, manifestó lo siguiente:

"Este informe que se me enseña es un informe hecho por mí, cuando era Superintendente de Terrenos Públicos en la Isla de Puerto Rico. El deslinde que hice en una parcela de terreno que existe en la zona del barrio de Puerta de Tierra de esta capital. Este es un terreno que pertenece al Municipio de San Juan, el solar donde está la fábrica de tabacos, antes cárcel, ahí digo: 'está situada esta parcela en la tercera zona del barrio de Puerta de Tierra de esta ciudad, adyacente a la margen sur de la carretera número 1 y en el tramo comprendido entre la primera y segunda líneas defensivas de esta plaza.' En la parte a que se refiere el Sr. Letrado, me ratifico en lo que antes dije. Dice, 'está situada esta parcela en la tercera zona del barrio

de Puerta de Tierra adyacente a la margen sur de la carretera No. 1.'
Quiero decir que la zona de terreno es adyacente a la carretera No. 1;
me refiero a la parcela vendida por el ayuntamiento de San Juan y
donde se instaló primitivamente el Hospital Civil y después fué cárcel
y hoy Colectiva.   Al deslindar esa parcela se dijo: 'en la zona de
terreno adyacente a la margen sur de la carretera No. 1.'   Vuelvo a
ratificarme; luego no es la carretera No. 1.   Es una zona sur ad-
yacente a la carretera No. 1, a esa me referí y me sigo refiriendo.
La colindancia esa no toca a la carretera, no dice eso.   Está perfecto
ese deslinde, porque se refiere a puntos determinados en el terreno.
El eje de la carretera hoy está indeterminado.   *   *   *

"Precisamente la carretera No. 1, antiguamente para fijar las
carreteras, se empezaba por determinar el eje y después el firme.
El firme en esa carretera hoy precisamente está algo indeterminado,
puesto que no tiene cunetas, sino que termina el firme tal como están
las calles hoy.   Esa carretera no tiene línea exacta determinada,
está aproximadamente determinada, y el único punto fijo en ella
exacto, es el que se utilizó para el deslinde, que son puntos invaria-
bles de mampostería y es a que se refiere el deslinde.   Está con toda
exactitud ese deslinde, es un deslinde fijado con todas las generali-
dades y la carretera es algo indeterminada, pues que no tiene cunetas.
Las cunetas hoy la forman el extremo afirmado del terraplén, como
están las calles de San Juan.   Precisamente es algo indeterminada
y los puntos antiguamente fijados allí son unos puntos invariables
de mampostería y ese deslinde se refiere a eso; las carreteras que
están en terraplén, no tienen una zona más afuera del pie del terra-
plén, en la Isla de Puerto Rico no se encuentra disposición oficial
alguna, ni existe sobre eso.

"Interrogado el testigo Señor Morales nuevamente por la parte
demandada, dijo: Este informe sobre la venta de edificios por el
Gobierno Insular, fué al Municipio de San Juan, se trataba de la
venta de la propiedad insular al Municipio de San Juan, de modo
que el Gobierno Insular podía fijar los lindes, siendo dueño del te-
rreno, fijar los lindes que creía conveniente; yo dije que una de las
ideas al fijar estos lindes y traspasar la propiedad al Municipio de
San Juan, fijando el límite norte de la propiedad a una distancia de
un metro de la fachada, fué dejar una amplitud suficiente para la
carretera, si se llevase a cabo algún tiempo el ensanche.   En este
contrato entre el municipio y el Gobierno no intervino nadie más,
sino El Pueblo de Puerto Rico o el Gobierno Insular y el Municipio de
Sán Juan, estas dos entidades solamente.   Precisamente una de las

ideas fué no perjudicar el del tranvía urbano tal como estaba establecido por la Real Orden y por eso fué que no se dieron terrenos al norte de esta línea.''

Requerido el testigo para que dé alguna explicación del *Exhibit* 8 del peticionario, que es un plano donde aparece la firma del testigo, y que de su faz aparece que es sobre las ''Reservas Navales en la ciudad de San Juan,'' como fué propuesto por la comisión conjunta compuesta del Capitán retirado de la Marina de los Estados Unidos, Sr. Sam. C. Lemly, en representación del Departamento de Marina de los Estados Unidos, y Frank Feuille, Fiscal General de Puerto Rico, por El Pueblo de Puerto Rico, el testigo continúa diciendo:

''El mismo plano, como he dicho, no dice que la carretera tenga 20 metros de ancho. Este fué un proyecto en que se trataba más de un convenio hecho para llevar el terreno ocupado por el Gobierno Federal y el Gobierno Insular; para señalar ciertas parcelas del Gobierno Federal, e indudablemente se trata de determinar el terreno y entregarlo al Gobierno Federal y el del Gobierno Insular. Y no quiere decir que la carretera tenga 20 metros, puesto que ahí está la vía, y la vía no está en la carretera. En segundo lugar, la descripción en inglés dice 'el lado sur de la carretera; si hubiera sido con la carretera lo natural es decir 'colinda con la carretera en el lado sur.' Eso es lo que dice, a mi entender. En español se dijo eso, que el terreno al lado sur de la carretera. De modo que tanto la certificación como el plano dice claramente que 'no es con la carretera' ''.

La Ley ''fijando la anchura de los caminos insulares y municipales,'' aprobada en marzo 14, 1907, prescribe lo siguiente: (bastardilla nuestra.)

''Sección 1.—Las carreteras insulares *de nueva construcción* tendrán como límite un ancho no menor de nueve metros sesenta centímetros (9.60m) en el plano de la rasante, más el ancho adicional necesario para los taludes de las trincheras y terraplenes aumentado en cada lado de la carretera por una faja o tira de terreno de un (1) metro de ancho, a partir del borde exterior de los taludes.

''Sección 3.—El Comisionado del Interior fijará el límite de los

caminos insulares *ya construídos tomando como base las anchuras mínimas prescritas en la presente; Disponiéndose, sin embargo,* que en caso de duda o de inconformidad por parte de los propietarios contiguos, se obtendrá el testimonio de testigos con referencia a los límites que les hubieren sido siempre conocidos, trayendo también a la vista los planos de los respectivos proyectos, si existieren, y tomando en cuenta cualesquiera señales existentes en otra sección del mismo camino, demostrando su anchura, sin dejar lugar a duda, y déslindando las propiedades contiguas.''

Las secciones 1 y 4 de la Ley ''para autorizar al Comisionado del Interior el estudio y construcción de un trozo de carretera que partiendo del Puente de San Antonio, termine en el de Martín Peña, paralelamente a la carretera central y por su lado sur,'' aprobada en marzo 11, 1909, pocas semanas antes de la concesión de la franquicia en cuyas disposiciones se basa esta acción, disponen lo siguiente:

''Sección 1ª.—Por la presente se ordena al Comisionado del Interior para que disponga se proceda al estudio y construcción de un trozo de carretera que partiendo del Puente de San Antonio, en la carretera central, dentro del Municipio de San Juan, en una línea paralela a la dicha central y por su lado sur, ocupando con tal fin una faja de terreno cuya anchura no sea menor de 20 metros y a una distancia de aquella carretera de ciento cincuenta metros aproximadamente, en cuanto sea posible.''

''Sección 4ª.—Terminada que fuere dicha carretera el Comisionado del Interior la conservará, a cuyo fin tendrá dicho funcionario todas las facultades de que actualmente está revestido por lo que respecta a la conservación de la carretera principal; pero en otros particulares el Municipio de San Juan tendrá respecto a dicha nueva carretera la jurisdicción que hoy ejerce sobre la carretera principal existente.''

La sección 1ª. de esa franquicia contiene entre otros párrafos, más o menos importantes, los siguientes:

''*Quinta:* Para una doble vía que parte de dicho punto frente a la referida estación de telégrafos sin hilos en dirección este y surdeste sobre el derecho de paso del concesionario y de dicha Compañía de Ferrocarriles de San Juan y Río Piedras que por la presente queda ensanchada a diez (10) metros para que pueda colocarse dicha doble vía, al punto en que dicho derecho de paso intersecta la calle inme-

diatamente al este del Club Unión y en lo que ahora es la parada 10 de dicho tranvía; junto con el cambiavía, desvíos y apartaderos ya construídos por toda dicha ruta; *Disponiéndose,* que sólo puede usarse una sola vía para cruzar el puente sobre el 'Caño de San Antonio'."

"*Octava.* Para una sola vía de donde termina la doble vía del concesionario en dicha parada 10 hacia el sur por la calle que empieza en la parada 10 hasta su intersección con la nueva calle que va ahora a construirse unos ciento cincuenta metros al sur de la carretera central, y de ahí, en una dirección hacia el este, sureste y sur, según sea el caso, a lo largo de dicha nueva calle o camino que luego va a construirse por la Isla de Puerto Rico y el Municipio de San Juan, uno o ambos, en una línea que generalmente corre en dirección paralela a dicha carretera central hasta el "Caño de Martín Peña," junto con tales cambiavías, desvíos y apartaderos sobre dicha ruta como luego puedan verse en el plano de esta ruta que ha de ser presentado y aprobado por el Consejo Ejecutivo de Puerto Rico.

"*Novena:* Para una sola vía desde la intersección de una extensión en la calle de Egozcue, conocida a veces por calle del Parque, en dicho barrio de Santurce, con el nuevo camino que ha de abrirse paralelo a dicho camino principal, de ahí en una dirección generalmente norte y nordeste a lo largo de dicha calle de Egozcue a través de dicha carretera central; y de ahí a lo largo del derecho de paso que actualmente tiene el concesionario, hasta dicho Parque de Borinquen, junto con los cambiavías, desviaderos y apartaderos ya colocados por dicha ruta. Se concede por la presente al concesionario la opción de poner doble vía a toda o a cualquier porción de dicho camino, o ramal, desde la intersección de dicha calle de Egozcue con la carretera central al Parque Borinquen y de construir allí los terminales convenientes y que sean necesarios para el manejo de sus carros.

"*Décima:* Para una sola vía desde donde está actualmente el edificio de las máquinas del concesionario a lo largo de su servidumbre de paso privado en una dirección generalmente suroeste hacia la carretera central; de ahí a través de dicha carretera central hasta su actual vía paralela a la dicha carretera central, y de ahí en una dirección generalmente hacia el sur, bien por la calle de Cerra o una de las dos calles inmediatamente al este de la misma, según pueda determinar el Consejo Ejecutivo hasta la vía descrita en el párrafo ocho de esta franquicia."

Y las secciones 5 a la 8 inclusives son como siguen:

"Sección 5.—El concesionario dentro de tres meses a partir de la fecha de su aceptación de esta franquicia empezará la construcción de esa parte de las líneas adicionales del tren autorizadas por los párrafos segundo, tercero, quinto y séptimo de la sección 1ª., y terminará y tendrá en funcionamiento aquellas partes de las líneas adicionales autorizadas por dichos párrafos dentro de quince meses a contar de la fecha de la aceptación de esta ordenanza.

"Y dicho concesionario empezará la construcción de aquella porción de las líneas adicionales del tren autorizadas en los párrafos octavo, noveno y décimo de la sección 1ª., de esta ordenanza que se encuentra entre la parada 10 y el puente de Martín Peña, dentro de tres meses a partir de la fecha en que le notifique el Comisionado del Interior que la nueva carretera por la que se autoriza la construcción de dicha línea adicional del tren está abierta y en condiciones de permitir a dicho concesionario que penetre en ella y comience la construcción de dichas líneas adicionales y terminará las mismas dentro de quince meses a contar de la fecha de dicha notificación por el Comisionado del Interior. En tanto pueda hacerse el trabajo de construir dicha línea adicional por dicha nueva carretera se llevará a cabo al mismo tiempo que se empiece a trabajar en la obra de abrir la carretera para comodidad de los viandantes y de los vehículos corrientes. Dicho concesionario por la presente se compromete a pagar veinte mil (20,000) dólares para el costo de dicho nuevo camino. El pago de dicha suma por el concesionario se hará a las autoridades, y en la forma y manera y tiempo que más adelante puede fijar el Consejo Ejecutivo.

"Sección 6.—El derecho de paso que ha de ser designado a dicho concesionario por dicho nuevo camino que ha de abrirse para el tráfico será de cuatro metros de ancho y siempre que sea posible pasará por el lado de dicho nuevo camino entre la cuneta y la acera.

"Sección 7.—Una mensura exacta de las rutas adicionales de dicho tren que por la presente se autorizan será sometida por el concesionario, por conducto del Comisionado del Interior, para la aprobación del Consejo Ejecutivo, como más adelante se prescribe aquí todos los planos de los cimientos del camino, vía, desviaderos, puentecillos, puentes y terraplenes para los mismos y de la construcción general de dicha vía adicional serán presentados al Comisionado del Interior y aprobados por él antes de procederse al trabajo de su construcción.

"Sección 8.—El derecho de paso para dichas líneas del tren y trolley por alto y construcción de alimentación que pueda ser incidental a las mismas en unión de las líneas que transmiten la corriente

a los ramales desde las plantas eléctricas a las líneas principales y secundarias se autoriza por la presente por y sobre todos los terrenos públicos insulares, y por el terreno, calles, y caminos de dichas municipalidades bajo la supervisión del Comisionado del Interior o de aquellas autoridades que tengan poder sobre los mismos; *Disponiéndose,* que en tanto se trata de las líneas de vía ya construída y en funcionamiento el derecho de paso de ellas y de los trolleys por alto y construcción de alimentación relativo a los mismos y de las líneas que trasmiten corriente a los ramales desde las plantas a las líneas principales y secundarias quedarán como están ahora.''

Si por virtud de las mensuras y de la llamada ''reserva'' sobre las cuales funda su caso el Gobierno y sin más acción o indicación de alguna intención más concreta de dedicar la faja de terreno así reservada para fines de la carretera las secciones 10 y 11 tuvieron por objeto tener aplicación inmediatamente a la porción de doble vía y derecho de paso descritos en el párrafo 5º. de la sección 1ª., resulta raro que al ratificar y ensanchar el viejo derecho de paso de la apelante para poder colocar la doble vía autorizada en ese párrafo al fijarse el término dentro del cual debe hacerse el trabajo (párrafo 1 de la sección 5), y en curioso contraste con los párrafos 8 y 9 de la sección 1, párrafo 2 de la sección 5 y los preceptos terminantes de las demás secciones citadas no aparece la más remota indicación de que hubiera la idea de ensanchar la carretera insular o de incluir las vías y derecho de paso de la apelante dentro de lo que ahora se alega como zona reservada para ella.

''Desde la decisión en el caso de *Dartmouth College* ha quedado establecida la doctrina que una concesión de derechos en propiedad pública que ha sido aceptada por el beneficiario, equivale a un contrato por el que se adquiere el derecho a estar protegido contra cualquier perjuicio por la acción del Estado o por las municipalidades que actúan por la autoridad del Estado. En relación con este principio y que ha de ser considerado cuando se interpreta una supuesta concesión de esta naturaleza, existe igualmente la bien conocida regla que requiere que dichas concesiones se hagan en términos claros para conferir derechos privados con respecto a propiedad pública y evitar el sucesivo dominio de tales privilegios en interés del público. Pero

aunque es cierto que tales concesiones no serán sostenidas como válidas cuando las palabras son dudosas y que la ambigüedad las vicia de nulidad, sin embargo esta regla está limitada por otra: que tal concesión y el estatuto que la autoriza deben recibir una interpretación razonable y no deberán ser interpretados de modo que anulen la intención de la legislatura; y que la ambigüedad debe ser tal que no desaparezca por las reglas de interpretación establecidas.   También es una bien conocida regla de interpretación, que en tanto sea claro el lenguaje del estatuto u ordenanza o esté libre de ambigüedades no queda sujeto a interpretación, sino que debe ser aceptado y hecho cumplir como está redactado.   Hablando en términos generales la interpretación práctica de un contrato por las partes al mismo por cualquier período de tiempo considerable antes de que llegue a ser materia de controversia se considera de gran influencia sino predominante." 12 R. C. L. 195, pár. 21, sección 195.

Interpretando las palabras "dentro del espacio reservado para ello" a la luz de estos principios, del contexto y de todos los hechos y circunstancias referidos anteriormente nos vemos obligados a resolver que el texto citado no se refiere a una zona como la comprendida en este caso,—que se fija en el sitio del cruce únicamente por líneas arbitrariamente trazadas de acuerdo con la teoría del Comisionado del Interior y sus subalternos, o de los comisionados designados para fines enteramente ajenos a la cuestión de fijar, dedicar, abrir o determinar los límites de cualquier camino público, respecto a la conveniencia de luego ensanchar la carretera, no estando autorizadas las mensuras que así fueron hechas por ninguna ley que directamente se refiera a la carretera pública de que se ha hablado, o a los caminos públicos en general,—y que se indica en otro punto por la segregación y venta de una parcela de terreno y por la fijación de sus colindancias de acuerdo con la misma teoría o con un plan semejante en proyecto digno de elogio pero necesariamente factible en un futuro más o menos lejano.

Si algo quiere decir la sección 11, que no sea la reglamentación de la vía que descansa sobre el camino mismo o zona actualmente en uso como parte del mismo, y si el tercer

párrafo de la sección 11 puede considerarse como que su objéto es algo más que un remedio para el cumplimiento de la obligación que se fija al concesionario en el párrafo anterior, creemos, sin embargo, que las alteraciones o reparaciones exigidas deben tener cierta relación, si no con el libre tránsito, por lo menos con "el debido drenaje y mantenimiento de dicho camino o vía pública."

Decir que sin hacer referencia o relación a los intereses o conveniencia de la apelante, o a la seguridad y comodidad del público que transporta dicha compañía, el Comisionado del Interior por virtud de la facultad que le ha sido conferida por la franquicia puede obligar a la apelante a construir y mantener en dicho punto o puntos según él lo disponga un cruce o un número de cruces que en nada tienen que ver con el tráfico, drenaje o mantenimiento de la carretera insular, quizás no es tan razonable como afirmar que él puede obligar a la apelante a "alterar" el declive de su camino para ajustarlo al de la *carretera* y pavimentar o afirmar el espacio que hay entre los raíles de cada una de sus dobles vías y en una distancia de pie a pie y medio en cada lado de la misma por toda la zona reservada por él para fines de carretera, a pesar del hecho de que ninguna otra porción de dicha zona ni se utiliza ahora ni pueda utilizarse para viajar o que en cualquier fecha no lejana pueda ser abierta al tráfico. De modo pues, que conectando simplemente los dos extremos del cimiento del camino nuevamente hecho, con la carretera propiamente dicha, podría proveer teniendo que hacer una pequeña alcantarilla o dos, prácticamente un doble camino desde la línea de segunda defensa al puente de San Antonio, y el plan por fantástico y sujeto a crítica que esté tendría el mérito de tener cierta relación con el objeto de la llamada reserva.

Pero no creemos que ni dicha posibilidad ni cruces de la clase de que aquí se trata de establecer fué alguna vez tenida en cuenta por ninguna de las partes en la franquicia de 1909, o por cualquier interpretación buena y razonable de dicho

documento puede sostenerse que está incluído entre las "alteraciones o reparaciones" a que se hace referencia.

Sin embargo, en el alegato presentado por el abogado del apelado el argumento se basa no tanto en los preceptos terminantes de la franquicia que sola y exclusivamente fueron alegados en la corte inferior, como en el derecho de entrada y salida que cualquier dueño de propiedad privada que esté igualmente situada pudiera ejercitar y de ofrecérsele resistencia hacerlo cumplir. Sin considerar los méritos de esta alegación será bastante con decir que la sentencia apelada en tanto pueda considerarse que está basada en el fundamento indicado, es nula y la cuestión así planteada no puede prosperar en esta apelación.

"Una sentencia es la última palabra de la ley en una controversia judicial. Puede, por tanto, definirse como la consideración y resolución final de una corte de jurisdicción competente sobre las cuestiones que le han sido sometidas, en una acción o procedimiento. Una definición más precisa es que una sentencia es la conclusión de la ley sobre las cuestiones contenidas en los autos, o la aplicación de la ley a las alegaciones y a los hechos declarados probados por la corte o admitidos por las partes, o que se considera que existen a falta de esto, en el curso de los procedimientos judiciales. Debe notarse que únicamente es una sentencia la pronunciada entre las partes en una acción sobre las cuestiones sometidas a la corte para su decisión." 15 R. C. L. 569, párrafo 2.

Si el demandado comparece y contesta, la corte puede concederle al demandante "lo que, siendo compatible con lo alegado en la demanda, estuviere comprendido en el asunto objeto del litigio." Código de Enjuiciamiento Civil, artículo 191.

"Para dar a una sentencia el mérito y finalidad de una adjudicación entre las partes, debe ser congruente no solamente con las pruebas, sino con las cuestiones presentadas en las alegaciones, porque las alegaciones constituyen la principal base de las sentencias y decretos. Una sentencia será nula si se aparta de las alegaciones, y basa en un caso que en dichas alegaciones no ha sido alegado, puesto que si se permitiera subsistir sería enteramente arbitraria o injusta,

y resolvería una cuestión sobre la cual no fueron oídas las partes.'' 15 R. C. L. 604, párrafo 43.

''Está bien establecido que la teoría por virtud de la cual fué juzgado el caso en la corte inferior debe sostenerse estrictamente en la apelación.'' 2 R. C. L. 79, párrafo 55, Idem, 183, pár. 156.

''Uno de los resultados más prácticos de la regla de que las cuestiones que no han sido promovidas en la corte inferior no pueden ser levantadas en la corte de apelación es que una parte no puede, al ser elevado un caso para su revisión a la corte de apelación, asumir una posición incompatible con la asumida por ella en la corte sentenciadora, y que las partes están limitadas a la teoría por la cual el caso fué juzgado o defendido en la corte inferior. Así pues, cuando ambas partes actúan sobre una determinada teoría de la causa de acción no se les permitirá desviarse de la misma al ser elevado el caso para su revisión. Y lo mismo sucede cuando las partes proceden por virtud de una teoría particular de defensa o de oposición a la misma.'' 3 C. J. 718, pár. 618, Idem, 669 *et seq.* y 727 *et seq.*

Véanse además los casos de *Figueroa* v. *Figueroa*, 23 D. P. R. 438, *El Pueblo* v. *Fajardo*, 23 D. P. R. 885 y *Belaval* v. *Todd*, 24, D. P. R. 820.

La contestación de la demandada negaba que el cruce era necesario como medio de acceso a los terrenos del peticionario que están situados al sur de la vía, y en el juicio y al tratarse de defenderse contra la posibilidad de tal derecho por virtud de ciertas alegaciones contenidas en la petición, ocurrió el siguiente incidente:

''Sírvase decir a la corte si el paso establecido en ese sitio tiende a obstruir o entorpecer el tráfico sobre la vía de la compañía demandada, en ese sitio, y si ofrece condiciones de peligro. La parte demandante se opone; eso no es pertinente al *issue* en este caso; eso no es defensa. Solamente se discute si la vía en ese sitio está en terrenos públicos, en la zona de la carretera. Si está en la zona de la carretera, según la franquicia de esta demandada, la demandada tiene la necesidad de mantener el paso que está establecido ahí, y si causa obstáculo el paso o nó, no afecta en nada a la cuestión. La parte demandada alega que si ésta hubiera sido la única cuestión planteada por la demanda, y si se hubiese planteado claramente, no tendría necesidad de ofrecer esta prueba; pero como verá S. S., la demanda está redactada en tal forma, que es difícil decir cuál es el verdadero fundamento de esta acción. En primer lugar, se alega

que la parte demandante tiene derecho a establecer un paso por ese sitio, porque forma parte de la carretera, de la zona reservada para la carretera y en virtud de las provisiones de su franquicia; y más tarde en la demanda apartándose por completo de esta contención, se alegan otros hechos que bajo este punto de vista no serían pertinentes, es decir, se alega que este es el único medio de acceso a la parcela de terreno que pertenece al Pueblo de Puerto Rico; y supongo que el objeto de esta alegación será establecer un derecho de paso a la parcela, que está separada de la carretera por otro trozo; y la parte demandante también ha ofrecido prueba sobre este punto para demostrar que éste es el único medio factible para entrar en la parcela de terreno perteneciente al demandante. Siguiendo esta idea, sin admitir que es una prueba pertinente, que es una prueba que debe tomarse en consideración en este caso, tenemos derecho a demostrar que este paso no ha sido establecido en un punto conveniente para la compañía demandada, porque según las provisiones del Código Civil, como sabe bien S. S., el punto en que debe establecerse una servidumbre de paso sobre una propiedad por el dueño del predio dominante, tiene que establecerse en un punto conveniente para el dueño del predio sirviente. Yo no sé si puede tener alguna importancia este punto, pero como la demandante ha alegado esta cuestión, me parece que tenemos derecho a demostrar que no es un punto conveniente, y que es un punto que ofrece peligro al funcionamiento de la demandada. Además, hemos alegado en la contestación, señor Juez, que el cruce en el punto establecido ofrece peligro al funcionamiento de la línea de la demandada, y constituye una infracción a la franquicia otorgada a la compañía demandada.

"El Hon. Juez dice: ¿En qué hecho de la demanda está alegado eso? El demandado contesta: en la contestación.

"El Hon. Juez pregunta ¿en qué hecho de la contestación? Y el demandado repuso: en el hecho séptimo de la contestación. Alega la demandada que dicha ocupación violenta por parte del demandante en las vías de la demandada, se verificó sin autorización legal para ello, y que el establecimiento y mantenimiento del paso a nivel en el sitio de referencia estorba el servicio de la compañía demandada y constituye un peligro para el funcionamiento de los carros eléctricos de ésta. Bajo el punto de vista de la conveniencia o inconveniencia relativa, como es una cuestión que tendrá que tomar en consideración la corte, también es pertinente la prueba que ofrecemos. La parte demandante dice: Hon. Juez: en este pleito no se trata de una servidumbre de paso por necesidad; nuestra demanda se funda

en una o dos cláusulas de la franquicia de la compañía demandada que provee que cuando la vía pase por terrenos públicos, tiene la compañía demandada que mantener a sus expensas los pasos que necesite El Pueblo de Puerto Rico, y para justificar que tenemos el derecho a ese paso, tenemos que probar que la vía está situada en terrenos públicos, en terrenos reservados para la zona de la carretera. Para obtener un *injunction,* tenemos que alegar graves perjuicios, daños irreparables, y ese es el objeto, el único objeto que tiene la alegación a que se refiere la parte contraria. Creo que es muy claro. Dice al final de la demanda: 'Que el peticionario, por medio de su Departamento de Sanidad, sufrirá grandes perjuicios y pérdidas irreparables, si no se permite que subsista dicho paso donde y como anteriormente estaba.' ¿En qué consiste este daño? Se sigue: 'Que cualquier otro medio de acceso o entrada y salida a dicho vertedero de basura, es impracticable y difícil, y le causaría grandes inconvenientes y gastos a dicho Departamento de Sanidad.' Eso no cambia esa demanda de *injunction* en una demanda de servidumbre de paso por necesidad. Y respecto a la contestación, la primera parte del hecho que ha leído la parte contraria, es inmaterial; por eso no tiene derecho a ofrecer prueba en apoyo de eso. Con respecto a la franquicia, es natural que si no podemos probar que el paso está situado en terrenos públicos, naturalmente hemos violado la franquicia y no tenemos derecho a tener ese paso a nivel. El Hon. Juez arguye; ¿pero cómo podría la corte impedir que la parte demandada probara una de las alegaciones de su contestación, que ha sido consignada por la parte demandante? Yo creo que bajo la teoría de que éste es un hecho alegado en la contestación, se puede solamente admitir la pregunta para demostrar lo que en la contestación a la demanda se alega por la compañía demandada, de que el paso a nivel en el sitio de referencia estorba al servicio de la compañía y estorba y obstaculiza el funcionamiento de los carros eléctricos. La parte demandada repone; pero el punto en cuestión a probar, es que el paso a nivel ese causaría grandes o irreparables daños a la compañía demandada. La corte admite la pregunta bajo esa teoría, que constituye un peligro para el funcionamiento de los carros eléctricos. * * *

"El demandante consigna una excepción a la resolución de la corte, admitiendo aquella pregunta sobre la clase de daños que sufre el tráfico de los carros eléctricos. Tomo excepción a todas las preguntas en ese sentido.''

Lo mismo sucedió durante el examen del siguiente testigo:

"Demandado. ¿Por qué fué que la compañía quitó los tablones y levantó el cruce en ese sitio? El demandado responde, porque en primer lugar un cruce público en ese sitio sería peligroso  *  *  * El demandante se opone respecto al peligro, por los mismos fundamentos que antes. El Hon. Juez dice, que si la pregunta fué, cuál fué el motivo de levantarse el cruce, el demandado responde, porque fué levantado el cruce por la compañía, entonces la representación del demandante manifiesta, que si se limita a decir que era peligroso, no me opongo, pero si dice en qué consistía el peligro, tenemos que oponernos. El demandado manifiesta que el testigo no ha terminado su contestación y es la misma cuestión suscitada esta mañana; la misma oposición. El demandante pregunta si se trata de justificar con el testigo que es un paso peligroso, y el demandado responde que no fué el objeto de la pregunta, pero vamos a preguntar sobre ese punto.

"Continuó el testigo respondiendo: cuando se estableció supimos que el cruce había sido puesto en ese sitio para los fines de la Junta de la Feria Insular, como un cruce de emergencia y como la Junta de la Feria Insular estaba haciendo grandes esfuerzos para poner en condiciones los terrenos de la Feria Insular para poder abrir la feria el día del Natalicio de Washington, y como en esas condiciones solamente estaría pocos días, y como nosotros estábamos haciendo lo posible para ayudar a los Directores de la Feria Insular, no hicimos nada. El permiso para un cruce permanente no hubiese sido concedido si hubiese sido pedido, porque es un sitio sumamente peligroso.

"El demandado dice al testigo, pero la pregunta es, ¿por qué fué que se levantó el paso? El demandante pide que se elimine la contestación, porque no es responsiva a la pregunta; el demandado manifiesta que cree que todo eso es una explicación preliminar de por qué fué levantado ese cruce; el Hon. Juez ordena al taquígrafo que lea la pregunta y la contestación que es leída. El demandado manifiesta que el testigo está explicando por qué fué dejado el cruce en ese sitio por tanto tiempo antes de levantarlo, por qué no fué quitado inmediatamente, y yo supongo que ahora va a explicar por qué fué levantado, que la parte demandante esta mañana preguntó al otro testigo señor Sewell por qué fué que ese cruce se había dejado tanto tiempo antes de quitarlo. El testigo manifiesta ahora que no ha terminado la contestación y el juez le dice que puede continuar.

"La parte demandante manifiesta que está conforme y se admite que se levantó porque se consideró peligroso, pero si va a explicar en qué consiste el peligro, tenemos que oponernos. Entonces la repre-

sentación ·de la demandada manifiesta que el testigo ahora dice que va a seguir explicando por qué es peligroso. El demandante dice que formula una nueva pregunta para oponerse y tomar excepción. La corte ordena se haga una nueva pregunta.

"El testigo contestó, llegó a mi conocimiento que el paso no tenía el carácter de temporero algunos días después, cuando noté que los carros de la Sanidad estaban utilizando el cruce.

"Demandada. Ahora sírvase decirnos por qué era peligroso ese cruce.

Demandante. Ahora nos oponemos por las mismas razones; se trata de introducir evidencia tendente a probar ·que era un sitio peligroso y eso no está en *issue*.

"El Juez manifiesta que va a admitir la pregunta bajo la misma teoría de esta mañana, porque es una alegación de la contestación.

"Demandante. Tomo excepción.

"El demandado manifiesta que no ha preguntado al testigo sobre su experiencia sobre carros eléctricos y tranvías, pero supone que la objeción no se basa en eso; el Hon. Juez manifiesta que se basa en que no es defensa. \* \* \*."

Y luego:

"La representación de la demandada pregunta al testigo, ¿qué efectos produce en el servicio de los carros eléctricos el paso o cruce en ese sitio? · El demandante consigna la misma oposición, por ser inmaterial. La corte admite la pregunta, y la parte demandante toma la misma excepción."

Aunque la demandada pudo de este modo, a pesar de la constante e insistente oposición del peticionario, presentar alguna prueba respecto a la naturaleza peligrosa del cruce para contrarrestar el gran inconveniente e irreparable perjuicio que se alegó en la petición, por lo menos hasta la fecha en que se hizo la "inspección ocular" si no hasta el momento de dictarse sentencia, el juicio no procedió en absoluto o en ningún estado del mismo basado en la teoría de una servidumbre real por el hecho de tener el dominio y el derecho de entrada y salida. Que el peticionario en la corte inferior negó insistentemente y de la manera más enfática semejante teoría resulta más que evidente.

De ahí se deduce que la compañía demandada jamás ha sido

oída en la corte en cuanto a ese aspecto de la cuestión y la alegación del peticionario hecha por primera vez en esta corte, basada en el principio que inspira a los artículos 571 y siguientes del Código Civil que han sido citados por analogía en el alegato del apelado se hace demasiado tarde. Esos artículos disponen en parte lo siguiente:

"Art. 571.—El propietario de una finca o heredad enclavada entre otras ajenas y sin salida a camino público, tiene derecho a exigir paso por las heredades vecinas, previa la correspondiente indemnización.

"Art. 572.—La servidumbre de paso debe darse por el punto menos perjudicial al predio sirviente, y en cuanto fuere conciliable con esta regla, por donde sea menor la distancia del predio dominante al camino público."

Y como acabamos de demostrar, el esfuerzo hecho por la apelante por anticiparse y defenderse contra semejante teoría del caso fué rechazado vigorosamente y con buen éxito por el demandante en la corte inferior.

Según el criterio que hemos formado del caso se hace innecesario considerar la alegación del apelante de que:

"1. Los hechos alegados en la demanda o solicitud no establecen causa para librar auto de *injunction* y la corte incurrió en error al expedir el auto fundado en tales hechos.

    *      *      *      *      *      *      *

"3. La corte incurrió en error al no declarar que el demandante está impedido (*estopped*) para sostener en contra a esta demandada que el referido sitio de paso está dentro de una zona reservada para carretera.

"4. La corte incurrió en error al admitir como prueba los documentos exhibits 1, 2, 6 y 7, del demandante.

"5. La corte incurrió en error al permitir que se le preguntara al testigo Larrínaga sobre significación de una memoria contra la oposición de la demandada.

"6. La corte incurrió en error al permitir las preguntas del demandante sobre reputación."

La sentencia apelada debe ser revocada.

*Revocada la sentencia apelada y anulado el auto de* injunction *permanente expedido.*

Jueces concurrentes: Sres. Presidente Hernández y Asociados Wolf y Aldrey.

El Juez Asociado Sr. del Toro, disintió.

OPINIÓN DISIDENTE DEL JUEZ ASOCIADO SEÑOR DEL TORO.

Después de haberse discutido ampliamente todas las cuestiones envueltas en este recurso, la mayoría de los jueces que componen esta corte ha optado por la revocación de la sentencia apelada. No puedo estar conforme. A mi juicio, penetrando en el fondo del asunto, resulta tan notoriamente injusta la actitud de la compañía demandada, que no debe tener el amparo de la corte. Lo sucedido en este caso debe estar siempre fijo en la mente de aquellos funcionarios encargados de disponer de las riquezas del pueblo por medio de franquicias, a fin de otorgar éstas con las debidas reservas y restricciones.

Para mayor claridad, debería comenzar mi opinión transcribiendo la solicitud de *injunction*. Sin embargo, prescindiré de ello para evitar repeticiones, ya que dicha solicitud se ha copiado en la opinión del tribunal.

La corporación apelante señaló los errores que atribuye a la corte de distrito, así:

"I. Los hechos alegados en la demanda o solicitud no establecen causa para librar auto de *injunction* y la corte incurrió en error al expedir el auto fundado en tales hechos. II. La corte incurrió en error al declarar que la prueba demuestra que el sitio en donde fué establecido el paso era espacio reservado para *camino* o vía de tránsito público. III. La corte incurrió en error al no declarar que el demandante está impedido (*estopped*) para sostener en contra a esta demandada que el referido sitio de paso está dentro de una zona reservada para carretera. IV. La corte incurrió en error al admitir como prueba los documentos *exhibits* 1, 2, 6 y 7, del demandante. V. La corte incurrió en error al permitir que se le preguntara al testigo Larrínaga sobre la significación de una memoria contra la oposición de la demandada (excepción pág. 48, de la transcripción). VI. La corte incurrió en error al permitir las preguntas del demandante sobre reputación (excepciones págs. 49, 50, 53, 54 y 56 de la transcripción)."

"1. Examinaré el primer error. Al argumentarlo, la apelante lo subdivide en cuatro partes que marca con las letras *a, b, c,* y *d.*

(a) Sostiene la apelante que "en el supuesto de que la demandada tenía el deber de construir el paso o cruce de acuerdo con la franquicia de 1909 a la orden del Comisionado del Interior o permitir que tal paso se estableciese, el *injunction* no es el remedio apropiado y procedente, sino el *mandamus.*"

A esto contesta con razón el apelado:

"Las dos secciones o cláusulas de donde se pretende deducir la improcedencia del remedio que interesamos, son bien claras en su texto, y en ellas puede verse que la obligación impuesta a la demandada no es una obligación o deber absoluto, sino que está sujeto a la siguiente alternativa: Si la compañía deja de actuar, entonces el Gobierno puede realizar la obra que se negare a ejecutar la demandada y hacerla por sí, con cargo a ésta. De modo que, asumiendo una negativa de la demandada, el mismo fin que se obtendría con el *mandamus,* se puede obtener por el Gobierno mismo, por virtud de la misma franquicia, lo que haría indiscutiblemente improcedente el remedio de *mandamus,* no tan sólo por no establecerse la obligación o deber absoluto, sino que además, resultaría un remedio evidentemente innecesario, ineficaz y no autorizado."

(b) "No resulta daño irreparable alguno de los hechos alegados en la demanda" y, por tanto, sostiene la apelante, "era improcedente el auto de *injunction.*"

La ley vigente en Puerto Rico autorizando la expedición de autos de *injunctions* (Compilación de 1911, pág. 292), es bien amplia. En su sección 3, fija siete casos en los cuales se puede hacer uso de este "brazo fuerte de la equidad." Uno de ellos es "cuando de la petición o declaración jurada resultase que la comisión o continuación de algún acto, durante el litigio, habrá de causar pérdidas o daños de consideración o irreparables a alguna de las partes."

Leyendo la solicitud puede verse en la forma que, al final de la misma, la parte demandante y apelada alegó los daños irreparables. El término "irreparable" ha adquirido en la

ley de *injunction* un significado que quizás no está en armonía con el origen de la palabra o la significación literal de la misma, dice R. C. L. en su Vol. 14, pág. 346.  Además, el estatuto no se refiere solamente a daños irreparables sino a daños de consideración, y no puede negarse que si el Pueblo de Puerto Rico tiene razón en este caso, sufriría si no un daño irreparable, por lo menos un daño de consideración al obligársele a conducir sus carros de basuras por otro camino cuyas condiciones tendré oportunidad de analizar más adelante.

(*c*) ''Las provisiones de la franquicia—alega la parte apelante—en que se funda la solicitud del demandante, no obligan a la demandada a construir y mantener un paso o cruce sobre la vía en el sitio a que se refiere la demanda por orden del Comisionado del Interior ni a permitir que tal paso se construyere y mantuviere.''

A mi juicio, tiene en parte razón la apelante en este extremo.  Basta leer con algún cuidado la cláusula de la franquicia transcritas en la solicitud, para concluir en seguida que la obligación de la compañía demandada de mantener a satisfacción del Comisionado del Interior el lecho de la vía entre los raíles y por un espacio de pie y medio en cualquier lado de ella donde quiera que dichos raíles crucen o descansen sobre el camino u otra vía de tránsito público, no lleva consigo la de construir el cruce de que se trata en el presente caso.

Si el reconocido en las referidas cláusulas al Comisionado del Interior, fuera el único derecho que tuviera El Pueblo en este caso, la sentencia apelada debería revocarse y desestimarse totalmente la solicitud de *injunction*.

(*d*) ''El auto de *injunction*—alega, por último, la parte apelante, para sostener el primer error,—era improcedente por no resultar de la demanda que el demandante tenía un derecho claro, legal o equitativo.''

Emitiré mi opinión con respecto a este extremo, al considerar el segundo de los errores señalados.

2. ¿Están las vías de la demandada, en el sitio donde existe

el cruce de que se trata, dentro de la carretera o del espacio reservado para ella, o no lo están?

La corte de distrito resolvió que estaban dentro del sitio reservado para la carretera.  La parte apelante sostiene que no están dentro de la carretera, porque jamás la carretera tuvo el ancho suficiente para ello;  ni que tampoco lo están dentro de la llamada zona reservada para la carretera, porque tal zona nunca existió, y si fué alguna vez demarcada, tal demarcación se hizo a espaldas suyas y no puede, por tanto, afectarle.

Aparece claramente de los autos que en 18 de febrero de 1878 se concedió por el Gobierno de España a don Pablo Ubarri la autorización necesaria para construir una línea férrea entre la capital de Puerto Rico y el pueblo de Río Piedras. El tranvía se construyó en efecto y una parte de sus líneas cruzaba por dentro de la carretera sostenida por el Estado y que comunicaba entonces y comunica hoy la capital, establecida en una isleta, con la isla grande de Puerto Rico.  En el sitio en donde existe el cruce origen de este pleito, el tranvía tenía sus raíles dentro de la carretera.

Transcurrió algún tiempo y el señor Ubarri solicitó y obtuvo del Gobierno de España que se le permitiera practicar ciertas variaciones en el trazado de la línea.  Una de ellas fué la de levantar las vías de la carretera y colocarlas fuera de la misma paralelamente a ella en casi toda su extensión. En el sitio de que se trata en este pleito, se colocaron las vías levantadas sobre un terraplén, construído expresamente por Ubarri, a la derecha, caminando hacia Santurce, de la línea de árboles que limitaba la carretera.

Tiene, pues, razón la parte apelante cuando sostiene que las vías de su antecesor Ubarri, después de la variación del trazado a que he hecho referencia, quedaron fuera de la carretera, cuyo ancho, de acuerdo con la ley en aquel entonces vigente, era de ocho metros.  2 Escriche 162 y ley citada.

Pasaron los años, se efectuó el cambio de soberanía y el

tranvía de Ubarri fué vendido, adquiriendo el comprador, como es natural, todos los derechos de Ubarri.

El seis de mayo de 1909 el Consejo Ejecutivo de Puerto Rico concedió a la San Juan Light and Transit Co., sucesora de Ubarri, el derecho de poseer, extender y operar un ferrocarril eléctrico entre San Juan y Río Piedras. La franquicia fué aprobada por el Gobernador el 11 de mayo de 1909, y por el Presidente el día 21 de los mismos mes y año. Contiene 33 secciones, se hace referencia en ella a la concesión original y sus modificaciones, a disposiciones del gobierno militar del nuevo soberano y del gobierno municipal y a otros particulares, y puede decirse que con ella comienza una nueva vida para el camino de hierro por el que ya en esa fecha cruzaban y han continuado cruzando carros eléctricos en vez de vagones arrastrados por locomotoras movidas por vapor. Las secciones 10 y 11 de la franquicia se transcribieron, traducidas al castellano en la demanda y a este respecto debe advertirse que en el último párrafo de la sección 11 se omitió traducir las siguientes palabras: "*or within the space reserved therefor,*" que debieron colocarse entre las palabras "pública" y "deberá" del dicho párrafo. Por la nueva franquicia se autorizó al concesionario para construir una doble vía entre otros por el sitio a que se refiere este pleito.

La compañía demandada, Porto Rico Railway Light & Power Company, adquirió la anterior franquicia y otras más, y el Consejo Ejecutivo, el 17 de marzo de 1911, aprobó el traspaso y dió nueva fuerza y vigor a las anteriores concesiones, bajo ciertas condiciones que con toda claridad se expresaron, y su acción fué aprobada por el Gobernador de Puerto Rico y por el Presidente de los Estados Unidos el 21 y el 30 de marzo de 1911, respectivamente.

Antes de otorgarse la franquicia de 1909, se deslindaron por personas debidamente autorizadas por ambos gobiernos, los terrenos de la isleta de San Juan, a los efectos de determinar cuáles correspondían al Pueblo de los Estados Unidos y cuáles al de Puerto Rico. Se levantaron planos y en ellos

se dió a la carretera por el sitio en cuestión, un ancho de veinte metros.

La doble vía concedida por la franquicia de 1909 se construyó, según declaración del testigo de la demandada T. W. Teele, en 1910. Para ello hubo necesidad de enanchar el terraplén, que se acercó más a la carretera, cortándose toda la línea de árboles que protegía el lado derecho de ésta, caminando hacia Santurce. La doble vía no invadió el firme de la carretera, la zona antigua de ocho metros, pero sí quedó dentro del espacio de veinte metros fijados en el deslinde de que dejo hecho mérito.

En el acto de la vista la parte demandante presentó prueba a los efectos de demostrar que desde los tiempos de la antigua soberanía se consideró siempre que la carretera tenía en el sitio de que se trata un ancho de veinte metros. La corte sentenciadora admitió y dió crédito a esa prueba, pero prescindiré en absoluto de ella y partiré en todas mis conclusiones de la base de que el ancho de la carretera durante la antigua soberanía fué el de ocho metros, que esos ocho metros, una vez que se varió el trazado de su primitiva línea por Ubarri, jamás volvieron a ser invadidos ni por Ubarri ni por sus sucesores en época alguna, y que el único documento en que oficialmente se dió a la carretera el ancho de veinte metros fué el deslinde indicado.

Para ver claro en este pleito es necesario fijar con toda precisión a quien pertenecen los terrenos sobre los cuales está la vía y los adyacentes a ellos. Esos terrenos pertenecieron siempre al soberano español, luego, a virtud del tratado de París, al soberano americano, y por último y en la actualidad, a la Isla de Puerto Rico, a cuya isla los cedió el soberano americano. Estos son hechos cuya certeza se admite por ambas partes.

Caminando hacia Santurce, a la izquierda de la doble vía de la demandada, quedan la carretera actualmente construída y luego los terrenos de la Feria Insular pertenecientes al Pueblo de Puerto Rico, que colindan al norte, con el Océano

Atlántico, y a la derecha, otra faja de terreno del Pueblo de Puerto Rico, luego la vía de la American Railroad Company of Porto Rico, y luego el vertedero de basuras del Departamento de Sanidad del Gobierno Insular que limita al sur con las aguas del puerto de San Juan, Puerto Rico. Los terrenos por donde pasan los raíles de la demandada, como hemos dicho, son también propiedad actualmente del Pueblo de Puerto Rico.

Al conceder España a Ubarri el derecho de cruzar con un tranvía esa zona de su propiedad y al ratificar el Consejo Ejecutivo de Puerto Rico la concesión de España, ¿se desprendieron de tal modo de sus derechos sobre la faja ocupada por las vías del concesionario, que quedaron colocados a su merced para establecer comunicaciones entre los terrenos situados a lado y lado de la vía?

Una respuesta negativa se impone, sin vacilación, a mi juicio. Todo ese sitio de la isleta de San Juan hasta el puente de San Antonio, se conocía por la tercera línea de defensa de la plaza fortificada de San Juan y no es posible ni por un momento suponer que fuera la intención del gobierno español el dificultar en manera alguna sus comunicaciones.

Se concedió un derecho de paso y ese derecho fijado de acuerdo con las circunstancias locales, es el único que se está obligado a respetar. La compañía demandada va demasiado lejos. Estoy conforme con ella en que su franquicia debe respetarse, en que su derecho de paso no puede obstruirse; pero no puedo estar con ella cuando sostiene que es árbitra para conceder o negar el cruce a través de sus vías al Pueblo de Puerto Rico, propietario de las tierras sobre las cuales se levantan esas mismas vías y de todos los terrenos adyacentes a ellas en el sitio en cuestión que linda, como hemos visto, al norte con el océano y al sur con la bahía, y que forma en su totalidad una faja relativamente estrecha de la pequeña isla en que está situada la capital de Puerto Rico.

Reducido a sus propios términos, el caso es simple. Queda limitado a investigar si los verdaderos derechos de la de-

mandada han sufrido perjuicio, esto es, si la facultad que indiscutiblemente tiene la demandada de explotar su tranvía ha sido en modo alguno perturbada por los actos de El Pueblo. A este respecto es de importancia la inspección ocular practicada por la corte, las vistas fotográficas presentadas por la misma parte demandada y los planos introducidos por ambas partes.

Todo ello, examinado cuidadosamente, demuestra que la corte sentenciadora estuvo justificada al concluir que el cruce en el sitio donde se encuentra en nada obstaculiza el libre y seguro tránsito de los carros de la demandada, y siendo éste, en esencia, el derecho que ella tiene, no puede sostenerse que se haya violado la concesión que se le hiciera.

Como puede verse, según la opinión que del caso he formado no es decisiva para mí la circunstancia de si los raíles de la demandada están o no dentro del espacio reservado para carretera. Pero ya que esta cuestión se debatió tanto en el pleito, diré que siendo los pueblos representados por ellas los únicos dueños de todas las tierras en cuestión, pudieran las autoridades federales e insulares fijar, sin necesidad de obtener el consentimiento de la demandada, el ancho que debería darse en el futuro a la carretera que une la capital con la isla. Claro es que al llevar a la práctica esos planes será necesario tomar en consideración los derechos adquiridos por la demandada. Cuando llegue el momento, si estuviere aún en vigor la franquicia de la demandada, entonces el Pueblo tendrá que ponerse de acuerdo con ella, para las variaciones que hubiere necesidad de practicar. Destruir el terraplén levantado por la demandada, alterar el trazado de sus vías en forma tal que no pudieran sus carros caminar debidamente, eso sí sería atacar el derecho de paso concedido; pero cruzar su vía cuantas veces sea menester, sobre todo como en este caso, para llevar a efecto un servicio público, sin daño para el funcionamiento debido de sus carros, es algo distinto.

3. Al considerar el segundo de los errores señalados, creo

haber expuesto con suficiente claridad y extensión mi manera de apreciar el caso, distinta en parte de la de la corte sentenciadora. Sin embargo, por diferentes caminos he llegado a la misma conclusión.

El criterio que he adoptado no exige que considere los errores señalados por la parte apelante con los números 3, 4, 5 y 6, ya que puede prescindirse de toda la prueba objetada por la dicha parte apelante y eso no obstante sostenerse la sentencia apelada.

Para concluir me limitaré a consignar que si se examina cualquiera de los varios planos presentados como prueba, que abarque la tercera línea de defensa de la ciudad de San Juan, P. R., se verá que al cruzar El Pueblo con sus carros de basura las vías de la demandada en el sitio en cuestión, va casi directamente con ellos al vertedero, y si se le obligara a usar el antiguo camino no afirmado, tendría que dar un largo rodeo a través de tierras arenosas en parte y en parte pantanosas, con detrimento de todo su servicio.

Por virtud de lo expuesto, opino que si bien la compañía demandada no está obligada a construir por ella misma el cruce de que se trata, ni a pagar el importe de los gastos hechos por El Pueblo al construirlo, lo está a respetarlo, no pudiendo oponerse a que El Pueblo siga pasando por él con sus carros de basura, siempre que con ello no obstaculice de modo cierto y efectivo su derecho de vía reconocido y ratificado en varias ocasiones.